
# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND



Chambers of
Matthew J. Maddox
United States Magistrate Judge
MDD_MJMChambers@mdd.uscourts.gov

101 West Lombard Street
Chambers 3B
Baltimore, Maryland 21201
(410) 962-3407

September 28, 2022

TO ALL COUNSEL OF RECORD

Re:  *Kim S. v. Kijakazi*
     Civil No. MJM-21-1344

Dear Counsel:

On June 1, 2021, Plaintiff Kim S. commenced this civil action seeking judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA," "Defendant") denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act. (ECF 1). Pending before the Court are Plaintiff's Motion for Summary Judgment (ECF 13) and Defendant's Motion for Summary Judgment (ECF 20).[1] I have reviewed the pleadings and the record in this case and find that no hearing is necessary. Loc. R. 105.6. (D. Md. 2021).

The Court must uphold the Commissioner's decision if it is supported by substantial evidence and if proper legal standards were employed.  42 U.S.C. §§ 405(g), 1383(c)(3); *Shinaberry v. Saul*, 952 F.3d 113, 123 (4th Cir. 2020). Under this standard, Plaintiff's motion will be denied, Defendant's motion will be granted, and the SSA's decision will be affirmed.

**I.     Background**

Plaintiff filed her application for DIB and SSI on April 16, 2019, alleging disability beginning on September 12, 2012. (R. 16). Plaintiff's application was initially denied on September 25, 2019, and the initial determination was affirmed upon reconsideration on December 23, 2019. (*Id.*) Thereafter, Plaintiff requested an administrative hearing, and Administrative Law Judge ("ALJ") Gary Ball held a telephone hearing on October 22, 2020. (*Id.*) Plaintiff, who was represented by counsel, testified at the hearing. (*Id.*) An impartial vocational expert also appeared and testified. (*Id.*) At the hearing, Plaintiff amended her alleged onset date to January 3, 2019, (which coincides with the death of her spouse) and withdrew her Title II application for appeal. (*Id.*) Following the hearing, the ALJ issued a decision denying Plaintiff's claim for DIB on February 3, 2021. (R. 15–27). On April 15, 2021, the Appeals Council denied Plaintiff's request for review

---

[1] The parties have consented to proceed before a United States magistrate judge pursuant to 28 U.S.C. § 636(c). (ECF 7).

Kim S. v. Kijakazi
Civil No. MJM-21-1344
September 28, 2022
Page 2

of the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (R. 2). Plaintiff then filed this civil action seeking judicial review under 42 U.S.C. § 405(g).

II.     **The SSA's Decision**

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In determining Plaintiff's disability claims, the ALJ followed the five-step sequential evaluation of disability set forth in 20 C.F.R. § 416.920.

> To summarize, the ALJ asks at step one whether the claimant has been working; at step two, whether the claimant's medical impairments meet the regulations' severity and duration requirements; at step three, whether the medical impairments meet or equal an impairment listed in the regulations; at step four, whether the claimant can perform her past work given the limitations caused by her medical impairments; and at step five, whether the claimant can perform other work.

*Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

If the first three steps do not yield a conclusive determination of disability, the ALJ then assesses the claimant's residual functional capacity ("RFC"), "which is 'the most' the claimant 'can still do despite' physical and mental limitations that affect her ability to work." *Id.* at 635 (quoting 20 C.F.R. § 416.945(a)(1)). The ALJ determines the claimant's RFC by considering all of the claimant's medically determinable impairments, regardless of severity. *Id*. The claimant bears the burden of proof through the first four steps of the sequential evaluation. *Id*. If she makes the requisite showing, the burden shifts to the SSA at step five to prove "that the claimant can perform other work that 'exists in significant numbers in the national economy,' considering the claimant's residual functional capacity, age, education, and work experience." *Lewis v. Berryhill*, 858 F.3d 858, 862 (4th Cir. 2017) (quoting 20 C.F.R. §§ 416.920, 416.1429).

In this case, at step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the amended alleged onset date of January 3, 2019. (R. 18). At step two, the ALJ found that Plaintiff had the following severe impairments: anxiety, major depressive disorder (MDD), trauma and stress related disorder, anal fissure with status post sphincterotomy, and obesity with status post gastric surgery. (*Id*.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*.)  Then, the ALJ found that Plaintiff had the RFC to perform medium work as defined in 20 CFR 416.967(c), *i.e.*, lift/carry 50 pounds occasionally and 25 pounds frequently, except:

> [Plaintiff] can occasionally climb ladders and scaffolds. She can frequently climb ramps and stairs, stoop, kneel, crouch, crawl and balance. She is

*Kim S. v. Kijakazi*
Civil No. MJM-21-1344
September 28, 2022
Page 3

> further limited to performing unskilled work involving routine tasks but can apply commonsense understanding to carry out detailed but uninvolved instructions. She should do no work at a production-rate pace, as in an assembly line, where each job task must be completed within strict time periods. She can have occasional interaction with supervisors, coworkers, and the public. She is limited to low stress work defined as requiring simple work-related decisions with only occasional changes in the routine work setting.

(R. 20). At step four, the ALJ found that Plaintiff is unable to perform any past relevant work as an assistant manager and caregiver. (R. 25). Lastly, at step five, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (R. 26). Thus, the ALJ concluded that Plaintiff was not under a disability, as defined in the Social Security Act. (R. 27).

### III. Standard of Review

The Court reviews an ALJ's decision to ensure that the ALJ's findings "are supported by substantial evidence and were reached through application of correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," which "consists of more than a mere scintilla of evidence but may be less than a preponderance." *Id*. (internal quotation marks and citations omitted). In accordance with this standard, the Court does not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the ALJ." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (internal brackets and citations omitted). Instead, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." *Id*. (citation omitted).

### IV. Discussion

This case centers around Plaintiff's claimed mental impairments. (R. 39). Plaintiff raises three issues: (1) whether the ALJ erroneously evaluated the medical opinion evidence; (2) whether the ALJ erroneously assessed Plaintiff's RFC; and (3) whether the ALJ erroneously evaluated Plaintiff's subjective evidence. (ECF 13-1 at 4–14). Since the issues raised are closely related to the ALJ's RFC determination, the Court begins with analyzing the pertinent portion of the ALJ's opinion.

#### A. The ALJ's Opinion

The ALJ first summarized Plaintiff's testimony. It is noted that Plaintiff does not drive and used to rely on her late husband to drive her to places, and then gets rides from her sister who currently lives with her. (R. 20) She is afraid to go outside her home but can go to appointments as needed. (*Id*.) She can read but believes her ability is lower than a nine-year-old's ability. (*Id*.)

Kim S. v. Kijakazi
Civil No. MJM-21-1344
September 28, 2022
Page 4

Plaintiff had a gastric bypass surgery in 2015.[2] (*Id.*) She is five feet, seven inches tall and now weighs 128 pounds. (*Id.*) Plaintiff last worked at Blake's Crab House in 2012.[3] She stopped working because she experienced significant fear. (*Id.*) Plaintiff also has problems focusing, and she is still grieving the loss of her husband. (*Id.*) She is receiving mental health treatment and taking medications, which are helpful, and her doctors are still making adjustments to Plaintiff's prescriptions. (R. 21) Plaintiff is able to take care of her own personal needs, such as shower and dress. (*Id.*) She has no issues with standing and walking. (*Id.*) She has some difficulty with memory, concentration, socializing and adapting to change. (*Id.*) On a typical day, Plaintiff takes care of her dog, and she can complete chores, such as washing dishes and vacuuming. She has a medical marijuana card and uses CBD oil to calm herself and for improved appetite. (*Id.*)

The ALJ then examined and summarized Plaintiff's medical records. Since Plaintiff's representative stated at the hearing that this is a psychological only case, which indicated that Plaintiff does not claim disability by physical impairments, and the ALJ found counsel's representation to be well supported by the medical evidence. (*Id.*) To assess Plaintiff's mental issues, the ALJ summarized and examined Plaintiff's mental status examination findings, treatment notes and counseling records, and medical opinions. The ALJ noted that prior to the amended alleged onset date, January 3, 2019 (which coincides with the death of her spouse), Plaintiff's mental status examinations by her medical health providers in New York were generally normal. (R. 22). In late January 2019, Plaintiff "she was seen for anxiety over the recent loss of her husband." (R. 22, 428–29). She reported that she was planning to move to Baltimore because she had friends and family there. (*Id.*) Plaintiff also reported that "she was having anxiety because all the responsibility was left to her now and she was living with her sister who was "'like another child.'"[4] (*Id.*) This was noted as "an acute episode of anxiety," and Plaintiff's "mood and affect were considered normal for grieving." (*Id.*)

Plaintiff subsequently relocated to Maryland, and received treatment for her issues from Holly Law, MD; Naomi Janney, LCSW-C; and other mental health providers at Villa Maria Continuum and Catholic Charities. (ECF 13-1 at 5; R. 565–81, 590–644). The treatment records show that Plaintiff first saw Ms. Janney on or about May 14, 2019. (R. 568). Ms. Janney noted that Plaintiff's "chief complaints were anxiety, depression and grief." (R. 22, 568). She reported having "intrusive thoughts and flashbacks surrounding the death of her husband." (*Id.*) The mental status examination was "normal except she was disheveled, had fleeting eye contact, had flight of ideas, and a sad affect." (*Id.*) Plaintiff was diagnosed with posttraumatic stress disorder, and the prognosis was "[g]ood with treatment." (R. 577).

---

[2] The ALJ's opinion stated that Plaintiff underwent surgery in 2014, but the record indicates that she had surgery in 2015. (R. 408).

[3] Plaintiff's work history report lists Crab House and indicates that she worked at the business from March 2007 to September 2012. (R. 254).

[4] Plaintiff stated during a visit to a mental health service in 2018 that "she ha[d] been 'helping others all [her] life," and that "she [took] care of her 53-year-old sister who appears to have some psychological problems." (R. 333). She also told her provider that "[h]er husband is disabled." (*Id.*)

On or about August 21, 2019, Plaintiff was seen by Dr. Law, a psychiatrist, for psychiatric evaluation. (R. 578). It was noted that "[Plaintiff's] primary stressor was dealing with the grief from the loss of her husband." (R. 22, 578). The mental status examination indicated some sadness but otherwise was unremarkable. (R.22, 579–80). Plaintiff was diagnosed with major depressive disorder (primary), generalized anxiety disorder (secondary), unspecified trauma and stressor-related disorder (secondary) and mild cannabis use disorder (secondary). (*Id.*) The prognosis was "fair, with treatment." (R. 580). Plaintiff then had a follow-up with Dr. Law on September 24, 2019, during which Plaintiff reported that she was "doing okay but still struggling with her grief" and having "frequent crying spells, anger and high anxiety." (R. 23, 609). She had "panic attacks about 1-2 times per week" and insomnia, but she denied concentration problems and dangerous thoughts. (R. 609). Plaintiff denied having any side effects from her medications. (R. 23, 609). It was noted that she had normal speech, appropriate language, good attention and concentration, goal directed thought processes, fair judgment and insight, fully oriented, good recent and remote memory, normal associations, and normal thoughts. (*Id.*)

Plaintiff had two more follow-up sessions in 2019 with Melanie Wells, CRNP-PMH, psychiatric nurse practitioner. On October 16, 2019, Plaintiff reported that she was doing "okay," and continued to grieve the death of her husband. (R. 23, 612). Ms. Wells noted Plaintiff's tearfulness and anxiety. (*Id.*) Plaintiff denied overwhelming sadness, and other than a depressed mood and affect, the mental status examination was normal. (*Id.*) On November 20, 2019, Plaintiff reported that she was "doing well" but continued to grieve the death of her husband. (R. 615). She did not mention any ongoing panic attacks. (R. 23). Her mood and affect were euthymic. (R. 23, 615). The severity of Plaintiff's condition was "Moderate" in both sessions. (R. 612, 615). The ALJ also noted Plaintiff's prescribed medications (such as Lexapro, Vistaril, Ativan, and Trazodone) and adjustment of dosage. Plaintiff reported improvement with medication and agreed to continue with the medication regiment. (R. 23, 615).

Additionally, the record includes reference to four sessions with mental health providers in 2020: one on or around August 2020,[5] and three televideo sessions with Dr. Law in August, September, and October 2020. The main issue continued to be grief over the death of Plaintiff's spouse. (R. 23, 618, 623). The diagnosis was moderate-major depressive disorder (primary), uncomplicated-cannabis abuse (provisional), generalized anxiety disorder (provisional), and reaction to severe stress, unspecified (provisional). (R. 24, 621). Mental status examinations were normal. (R. 23, 624–26, 630–32, 639–40). Depression, anxiety and trauma were assessed as stable. (R. 23, 626, 632–33, 635, 641–42). The medication regimen continued with the addition of Buspirone in October 2020 for anxiety. (R. 23, 627, 642). Plaintiff denied issues with concentration and side effects from the medication. (R. 23, 629, 638).

In sum, the ALJ determined that, while Plaintiff exhibited "some depression and anxiety," she "seem[ed] able to function for the most part," and her "[m]ental status examinations were normal except for mood and affect, which were also normal at times." (R. 23). The ALJ also noted

---

[5] Both Ms. Janney and Emily Winicki, a clinician signed the medical record in August 2020.

that the records "reflected [that Plaintiff] continued to have grief but she denied overwhelming sadness, there was no evidence of persistent panic attacks, and moderate symptoms were assessed." (*Id*.) "By November 2019, [Plaintiff's] symptoms appeared to be stable and under control with medication." (*Id*.) Moreover, there was "no evidence of any significant changes in her symptoms in 2020, indicating she was still doing well." (R. 24). Therefore, the ALJ concluded that "the mental limitations in the above residual functional capacity are consistent with the evidence of no more than moderate mental health symptoms." (R. 25).

The ALJ also evaluated Plaintiff's function reports, dated June 23, 2019, and November 05, 2019, which noted that Plaintiff "has difficulty around others, some days is unable to eat, does not drive due to anxiety, does not participate in social activities, has some memory problems, does not trust authority figures, does not handle stress or changes in routine well, constantly worries and is disabled due to her impairments." (*Id*.) The ALJ found that "the severity of her symptoms and the alleged effects on her ability to function are not consistent with [her] own statements and reports, as well as the medical evidence." (*Id*.)

Furthermore, the ALJ considered the medical opinions from the State Agency psychological consultants and Ms. Janney. The State Agency psychological consultants determined that Plaintiff was not disabled based on review of Plaintiff's file, including medical records received before early December 2019. (R. 81–94, 107–20). The ALJ found the State Agency psychological consultants' assessments persuasive. (R. 24). The ALJ reasoned that the mental health limitations were generally consistent with the conservative nature and effectiveness of treatment, to include psychological medications and counseling. (*Id*.) The ALJ also noted that the records do not contain recent hospitalization for psychological issues; nor any evidence of significant memory deficits or problems with understanding or applying information. (*Id*.) The ALJ found the consultants' citations to the record evidence support their opinion. (*Id*.) Although Plaintiff "had a history of depression, trouble dealing with stressful situations, symptoms of worrying, crying, and feeling overwhelmed," she was appropriately evaluated and treated by mental health professionals. (*Id*.) The ALJ also noted that Plaintiff's recent mental status examinations showed that she was "well groomed, casually dressed, good eye contact, good level of cooperation, alert, articulate speech, fidgety motor activity, logical stream of thought, no psychotic thought, sad affect and mood, oriented, good recent and remote memory, and fair insight and judgment." (*Id*.) Therefore, the ALJ concluded that no more than moderate limitations are warranted. (*Id*.)

Ms. Janney submitted a Medical Source Statement of Ability to Do Work-Related Activities (Mental) dated October 20, 2020. (R. 645–47). Ms. Janney opined that Plaintiff "has a 'marked' restriction in the ability to handle conflicts with others; respond to requests, suggestions, criticism, correction and challenges; adapt to changes; manage her psychologically based symptoms; [and] be aware of normal hazards and taking appropriate precautions." (ECF 13-1 at 5–6; R. 645–46). She also stated:

> [Plaintiff] suffers from severe anxiety, manifested by excessive worry, hyper-vigilance, panic attacks, crying spells, compromised memory and thought processing. These symptoms have deteriorated further since the

*Kim S. v. Kijakazi*
Civil No. MJM-21-1344
September 28, 2022
Page 7

> Covid-19 crisis and now [Plaintiff] expresses severe anxiety about leaving home at all. The sudden loss of her partner has exacerbated symptoms above.

(ECF 13-1 at 6; R. 647).

The ALJ found Janney's opinion unpersuasive for several reasons. (R. 25) The ALJ explained that Ms. Janney's opinion was not supported by her own examination of Plaintiff, which "show[ed] moderate depression and no mention of 'severe' anxiety." (*Id.*) The ALJ also pointed out that Plaintiff repeatedly reported to her providers that her main issue was grief. (*Id.*) Furthermore, Ms. Janney's opinion was not consistent with the records that consistently "show[ed] conservative treatment, stable symptoms, good response to medication, and normal mental status examinations, including appearance, mood and affect, attention/concentration, thought processes, cognition, memory, insight, and judgment." (*Id.*) The ALJ identified a lack of support for the notion that Plaintiff's anxiety was more severe than moderate.

In sum, the ALJ's RFC determination was based upon his evaluation of the objective medical evidence, treatment records, Plaintiff's activities of daily living, her statements and reports, and the opinions of the examining and non-examining physicians.

### B. ALJ's Assessment of Medical Opinions

Turning to Plaintiff's arguments, first she argues that the ALJ erroneously discounted Ms. Janney's opinion. Plaintiff seems to suggest that the ALJ's reason for fiding Ms, Janney's opinion unpersuasive was that Ms. Janney only saw Plaintiff once.[6] Plaintiff then avers that Ms. Janney's opinion should be given at least equal weight as that of the State Agency psychological consultants, who never examined Plaintiff and only reviewed records generated in or before 2019. Plaintiff's argument misses the mark.

For claims filed on or after March 27, 2017 (such as Plaintiff's claim in this case), an ALJ does not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from a claimant's medical source." 20 C.F.R. § 404.1520c(a). Instead, the ALJ considers medical opinions and prior administrative medical findings using five factors: (1) supportability; (2) consistency; (3) the medical source's relationship with the claimant; (4) the medical source's specialization; and (5) other factors, such as the medical source's familiarity with other evidence in the claim, and understanding of the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). The first two factors, supportability and consistency, are the most important in determining the persuasiveness of a medical source's opinion. 20 C.F.R. § 404.1520c(a). The ALJ is not required to explain the consideration of the other three factors. 20 C.F.R. § 404.1520c(b)(2). With respect to supportability, "[t]he more relevant the objective medical evidence and supporting

---

[6] Plaintiff stated that Ms. Janney "treated [her] for the past 1 ½ years on an ongoing, regular basis." (ECF 13-1 at 6). It is not clear how many times Ms. Janney evaluated and treated Plaintiff before submitting her opinion. The record shows that Ms. Janney saw Plaintiff in May 2019, and possibly in August 2020.

explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1). As to consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

As discussed above, the ALJ's assessments of Ms. Janney's opinion were based on his analysis of Plaintiff's medical records, with a focus on whether they supported and were consistent with Ms. Janney's opinion. The ALJ commented that Ms. Janney's opinion was not supported by the notes from her own examination of Plaintiff. He also noted the inconsistencies between Ms. Janney's opinion and the rest of Plaintiff's medical record "showing conservative treatment, stable symptoms, good response to medication, and normal mental status examinations, including appearance, mood and affect, attention/concentration, thought processes, cognition, memory, insight, and judgment." (R. 25). The ALJ evaluated the assessments from the State Agency psychological consultants in a similar manner. Contrary to Plaintiff's argument, the validity of an ALJ's assessment of medical opinions does not hinge on whether or how many times the medical source examines a claimant. Because, in this case, the ALJ's assessments of the medical opinions are supported by substantial evidence in the record, Plaintiff cannot establish that the ALJ erroneously evaluated the medical opinion evidence.

### C. ALJ's RFC Analysis

Second, Plaintiff argues that the ALJ's RFC analysis is not based on substantial evidence.

"RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling ("SSR") 96-8P, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). The RFC assessment represents the most a claimant can do despite any physical and mental limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a). Thus, when an ALJ assesses a claimant's RFC, he is expressing it in terms of the claimant's maximum remaining ability to perform sustained work. See SSR 96-8p, 1996 WL 374184, at *2. The RFC assessment must be based on all of the relevant evidence in the case record, such as: medical history, medical signs and laboratory findings, treatment records, reports of daily activities, lay evidence, medical source statements, effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment, evidence from attempts to work, need for a structured living environment, and work evaluations, if available. See SSR 96-8p, 1996 WL 374184, at *5. But age and body habitus are not factors in assessing RFC. Id. at *1. "In performing this assessment, an ALJ 'must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations).'" Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (citing Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015)). "In other words, the ALJ must both identify evidence that supports [their] conclusion and 'build an accurate and logical bridge from [that] evidence to [their] conclusion.'" Id. (citing Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016)).

Here, the ALJ's RFC assessment is based on his analysis of the evidence in the record, which he summarized and analyzed in narrative form in the decision. (R. 20–25). As discussed above, the ALJ first summarized Plaintiff's testimony, and then summarized and examined her medical records, as well as medical opinions about her condition. The ALJ also discussed Plaintiff's function reports. The ALJ then concluded that Plaintiff's "physical impairments are under control, there do not appear to be any significant physical problems currently, and current physical impairments are borderline nonsevere." (R. 23). As to her mental health, the ALJ stated that Plaintiff "has some depression and anxiety but seems able to function for the most part" and her "[m]ental status examinations were normal except for mood and affect, which were also normal at times." (*Id.*) The ALJ explained that the records from her mental health providers reflected that Plaintiff "continued to have grief" as a result of her spouse's sudden death in January 2019 but "she denied overwhelming sadness, there was no evidence of persistent panic attacks, and moderate symptoms were assessed."[7] (*Id.*) The ALJ noted that Plaintiff's "symptoms appeared to be stable and under control with medication" in 2019, and there "was no evidence of any significant changes in her symptoms according to treatment notes … in 2020, indicating she was still doing well." (R. 23–24). The ALJ also evaluated Plaintiff's function reports and found that "the severity of her symptoms and the alleged effects on her ability to function are not consistent with [her] own statements and reports, as well as the medical evidence." (R. 24).

The ALJ's determination is supported by evidence in the record. Furthermore, the ALJ considered the medical opinions from Ms. Janney and the State Agency psychological consultants. It was after evaluating the entire record and explaining his findings, that the ALJ concluded that Plaintiff's RFC in this case "are consistent with the evidence of no more than moderate mental health symptoms." (*Id.*) The ALJ's assessment of Plaintiff's RFC is supported by substantial evidence in this case.

Plaintiff further argues that the ALJ ignored Plaintiff's testimony about her illiteracy by failing to include any limitations related to that factor in his hypothetical question to the vocational expert. Based on the ALJ hypothetical, the vocational expert testified that the hypothetical individual could perform the job of warehouse worker[8] DOT number 922.687-058. (R. 26). According to Plaintiff, the tasks required to perform that job involve reading and writing. (*Id.*) However, the vocational expert provided two additional jobs: custodian (DOT 381.687-018, SVP 2, medium, 83,000 jobs nationally) and night cleaner (DOT 323.687-014, SVP 2, light, 133,000 jobs nationally). No evidence suggests, and Plaintiff does not argue, that the tasks required to perform the two jobs involve a reading and writing level in excess of Plaintiff's abilities. Therefore, even if the ALJ erred in constructing the hypothetical, that error would be harmless.

---

[7] Plaintiff argues that the record showed that panic attacks were noted during multiple office visits, but they all took place in 2019. (R. 516, 578, 609). Ms. Janney's opinion mentioned panic attacks, and it is not clear when those panic attacks occurred. (R. 647)

[8] Plaintiff mistakenly identifies this position as "custodian." (ECF 25 at 4).

### D. ALJ's Assessment of Plaintiff's Subjective Evidence

Plaintiff next argues that the ALJ erroneously evaluated her statements about her symptoms and refused to give weight to the lay statements, *i.e.*, her function reports dated June 23, 2019, and November 05, 2019. Plaintiff avers that the "evidence in this case reflects a very dependent woman with a history of special education who lost her husband on which she totally depended on for everything," and the ALJ must "clarify the basis for his decision to exclude the Plaintiff's representations regarding her capabilities." (ECF 13-1 at 14).

To evaluate a claimant's self-reported symptoms, the ALJ must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (S.S.A., Mar. 16, 2016). *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020). "First, the ALJ must determine whether objective medical evidence presents a 'medically determinable impairment' that could reasonably be expected to produce the claimant's alleged symptoms." *Id.* (quoting 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3). "Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled." *Id.* (quoting 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4).

In considering the intensity, persistence, and limiting effects of the symptoms, the ALJ examines the entire case record, including the objective medical evidence; the claimant's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the case record. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4–7. The ALJ can also consider factors such as daily activities; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; and treatment, other than medication, received for relief of pain or other symptoms. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *7.

Statements about the intensity, persistence, and limiting effects of symptoms will be evaluated in relation to the objective medical evidence and other evidence. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *8. The ALJ considers whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between the claimant's statements and the rest of the evidence. *Id*. But the ALJ "may 'not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate' them." *Arakas*, 983 F.3d at 95 (quoting SSR 16-3p, 2016 WL 1119029, at *5). The symptoms, including pain, will be determined to diminish claimant's capacity for basic work activities to the extent that the alleged functional limitations and restrictions due to the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *8.

As discussed above, the ALJ summarized Plaintiff's self-reported symptoms and testimony, noting that they are "not fully consistent with the record." (R. 20). The ALJ found that Plaintiff's

*Kim S. v. Kijakazi*
Civil No. MJM-21-1344
September 28, 2022
Page 11

"medically determinable impairments could reasonably be expected to cause some of the alleged symptoms." (R. 21) But the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (*Id.*) The two function reports dated June 23, 2019, and November 05, 2019, werre completed by Plaintiff's son on her behalf. They each contain similar information, and their content is summarized in the ALJ's opinion. (R. 24, 262–72, 284–94).

The ALJ specifically addressed the allegations in these reports and found "that the severity of [Plaintiff's] symptoms and the alleged effects on her ability to function are not consistent with the claimant's own statements and reports, as well as the medical evidence." (R. 24). The ALJ pointed to specific inconsistencies between Plaintiff's statements and what she reported to her medical providers. For example, in her 2019 function report, Plaintiff "alleged not leaving the house for four years except to attend doctor appointments," but she made statements to providers suggesting that she joined a gym in 2015, and she was working at Helping Hands in 2018. (R. 25, 396, 425, 526).[9] Plaintiff also reported "being able to care for her dog, handle personal care, do light chores, leave for doctor appointments, manage finances, watch TV for three hours per day, and follow instructions 'on a good day.'" (R. 24). Moreover, the ALJ opined that the fact that her "symptoms [were] assessed by providers as moderate and stable" and the "numerous unremarkable mental status examinations of record other than an abnormal mood at times," could not support her allegations. (R. 25). Accordingly, Plaintiff cannot establish that the ALJ erroneously analyzed her subjective complaints, and the ALJ's evaluation of the subjective statements was supported by substantial evidence.

V.      **Conclusion**

Because there is substantial evidence to support the ALJ's findings, and the findings were reached through application of the correct legal standards, Plaintiff's Motion for Summary Judgment (ECF 13) will be denied, and Defendant's Motion for Summary Judgment (ECF 20) will be granted. The SSA's decision will be affirmed pursuant to sentence four of 42 U.S.C. § 405(g).

A separate Order will follow.

Sincerely,

/S/

Matthew J. Maddox
United States Magistrate Judge

---

[9] It appears that Plaintiff also told her providers that "she [felt] . . . very active at work," "work[ed] 6 hours/day x6 day/week" in 2016, was "doing some part-time work helping a friend who opened a restaurant," and "went to Florida for her 50th birthday" in 2017. (R. 453, 455, 472).